# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**JANE R. G. DOE,**                                         CASE NO. 1:18-cv-1007

          **Plaintiff.**

**v.**                                                             HON.

 **MICHIGAN STATE UNIVERSITY;**
**THE BOARD OF TRUSTEES OF MICHIGAN**                **COMPLAINT AND JURY**
   **STATE UNIVERSITY;**                                     **DEMAND**
**MICHIGAN STATE UNIVERSITY SPORTS**
   **MEDICINE CLINIC;**
 **LAWRENCE G. NASSAR (individually);**
 **WILLIAM D. STRAMPEL (individually);**
 **JEFFREY R. KOVAN (individually);**
 **DOUGLAS DIETZEL (individually);**
 **GARY STOLLAK (individually);**
 **MICHAEL SHINGLES (individually);**
 **IRA ZALTZ (individually);**
**USA GYMNASTICS, INC.;**
**TWISTARS USA, INC, dba GEDDERT'S**
   **TWISTARTS GYMNASTICS CLUB, USA;**
   **and**
 **JOHN GEDDERT (individually),**

          **Defendants.**

_____/

PAUL H. GRANT, (P72906)                    MATTHEW A. FERRI (P71439)
PLANNING WITH PURPOSE, INC                LAW OFFICE OF MATTHEW A. FERRI, PLLC
Attorney for Plaintiff                    Attorney for Plaintiff
2031 – 196th St SW, Suite B-201           6001 N. Adams Road, Suite 135
Lynnwood, WA 98036                        Bloomfield Hills, Michigan 48304
T (425) 939-9948 / F (800) 569-4004       T (248) 409-0256 / F: (248) 409-0266
paul@planningwithpurposeinc.com           matt@ferrilawpllc.com

# COMPLAINT

**NOW COMES** Plaintiff, Jane R. G. Doe, by and through her attorneys, PAUL H. GRANT of Planning With Purpose, Inc and MATTHEW A. FERRI of Law Office of Matthew A. Ferri, PLLC, and states the following for her Complaint and Jury Demand:

## INTRODUCTION AND BACKGROUND

1.     This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiff as a result of the acts, conduct, and omissions of Lawrence Gerard Nassar ("NASSAR"), Michigan State University ("MSU"), Board of Trustees of Michigan State University (collectively with Michigan State University, "MSU"), MSU Sports Medicine Clinic ("CLINIC"), William D. Strampel ("STRAMPEL"), Jeffrey R. Kovan ("KOVAN"), Douglas Dietzel ("DIETZEL"), Gary Stollak ("STOLLAK"), Michael Shingles ("SHINGLES"), Ira Zaltz ("ZALTZ"), Eric A. Covan ("COVAN"), USA Gymnastics, Inc. ("USAG"), Twistars USA, Inc (dba: Geddert's Twistars Gymnastics Club, USA) and John Geddert, individually (collectively, "TWISTARS"), and their respective employees, representatives, and agents, relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by NASSAR against Plaintiff.

2.     Plaintiff was a gymnast at TWISTARS from 2005 through 2010 and was introduced to NASSAR at the TWISTARS facility.  Plaintiff was a competitive gymnast and trained at TWISTARTS and participated in USAG sanctioned events.  Plaintiff paid TWISTARS to be trained at its facilities and to be chaperoned at practice and events.  Plaintiff paid USAG to be a member.

3.     Plaintiff began seeing NASSAR at the age of 12 for a period of 4 years, approximately from 2007 – 2011.  Shortly after beginning to see NASSAR at TWISTARS, NASSAR requested Plaintiff begin seeing him at the CLINIC where NASSAR was employed. Plaintiff regularly visited CLINIC, and NASSAR continuously requested for Plaintiff to continue sessions with him under the guise of medical treatment.  It has now been discovered that NASSAR, under the supervision of TWISTARS, MSU, MSU TRUSTEES, USAG, and others, has sexually molested and assaulted hundreds of girls, most of whom were minors, as was Plaintiff.

4.     At all relevant times NASSAR:

   a.   was employed by MSU and CLINIC;

   b.   was sanctioned and retained by USAG to provide medical treatment to gymnasts;

   c.   was invited to TWISTARS's facility;

   d.   had unfettered access and was invited and encouraged to build relationships with minors at TWISTARS, MSU, CLINIC, and USAG; and

   e.   was under the supervision of MSU, CLINIC, STRAMPEL, KOVAN, STOLLAK, and DIETZEL.

5.     NASSAR came highly recommended to Plaintiff as a renowned orthopedic sports medicine physician, purportedly well-respected in the sports medicine community, specifically in the gymnastics community as the Team Physician for the United States Gymnastics team.  His credentials were often touted and created an environment that Plaintiff was lucky to have access to NASSAR and that he was one of the world's most leading experts in his field of osteopathy. He was known as "the best of the best."

6.     Gymnastics is a harsh sport, and all gymnasts end up injured in one degree or another when in competitive gymnastics.  Plaintiff was no different.  She trained minimally 4 days a week,

averaging 24 hours a week, at TWISTARS.  Plaintiff trained after school and on weekends, including competitions and meets each year.  Plaintiff's training created multiple injuries to her elbow, shoulders, back, hips, wrists, ankles, and hands.  The conglomerate of repeated injuries created chronic pain and the inability to fully perform.

7.     While at TWISTARS, Plaintiff was directed by coaching staff to see NASSAR for several injuries.  Many times, NASSAR saw Plaintiff at TWISTARS without parental supervision or knowledge.  After many visits at TWISTARS, NASSAR invited Plaintiff to see him privately at the CLINIC.

8.     At the CLINIC, NASSAR was more aggressive in his treatment plan with Plaintiff. Plaintiff had low-back and hip pain, and NASSAR utilized treatments that were intrusive. NASSAR recommended a treatment plan that manipulated ligaments, tendons, bones, and muscles through Plaintiff's pelvis and pubis area.

9.     NASSAR claimed that this procedure was called myofascial release.  NASSAR repeatedly placed pressure on, near, and around Plaintiff's vagina with his fingers and claimed he was making adjustments that could not be done in any other manner.  NASSAR also performed manual pelvic adjustments and re-alignments by way of pubis and cervical release.

10.     NASSAR's repeated procedures caused Plaintiff extreme discomfort and pain. NASSAR would maneuver his fingers and move them around Plaintiff's vagina area to create pressure points for the pubic bone area.  NASSAR applied pressure and force throughout the procedure, often times making Plaintiff wince in pain and discomfort.  NASSAR did not stop when Plaintiff experienced such pain and discomfort but continued the procedure, most times for more than 15 minutes or longer.

11.     Often times NASSAR would touch Plaintiff with his bare fingers, not using gloves or lubricants.  Because he did not utilize or follow proper medical protocols, NASSAR would massage or rub Plaintiff's vagina in order perform these procedures.

12.     Simultaneously, NASSAR would position his other hand and fingers on Plaintiff's hips, buttocks, anus, and other areas of her body that were intimate and considered private, except that Plaintiff believed NASSAR was a doctor and accepted such touchings as a part of the medical procedure.  NASSAR would place his thumb on or at the entrance of Plaintiff's anus creating pressure and freely moving around Plaintiff's anus.  NASSAR always utilized some other form of force or pressure to hold Plaintiff in position to restrict her movement.

13.     NASSAR would rarely have other practitioners, nurses, or other staff in the room during these procedures.  At times that other students or staff were in the room, the procedure would not be performed, rather, during the time students were in the room he would discuss Plaintiff's issues, check range of motion, and perform other procedures, but not sexually assault Plaintiff.

14.     Plaintiff would receive a momentary relief from the pain by the procedure, but her pain returned the next day and it never subsided and never became less intense by the procedures. Rather, the procedures were merely a mask to produce an immediate response, enticing Plaintiff to return for further treatments, and were never intended to create a long-range, full health result.

15.     NASSAR also gave Plaintiff acupuncture and administered facet block and trigger-point injections.  NASSAR recommended specialized topical creams and other medications.  All of these treatments were of minimal affect and controlled by NASSAR.

16.   NASSAR would perform deep tissue massage on Plaintiff's back, buttocks, hip flexors, and other body areas, even though outside practitioners were also utilized for rolfing and other deep tissue massage.

17.   NASSAR requested that Plaintiff wear shorts or loose clothing so he could easily access her intimate body locations and could see her whole body.  NASSAR regularly instructed Plaintiff to remove her underwear for visual and physical accessibility.

18.   With the failed medical recommendations, NASSAR would therefore claim that more visits were necessary, keeping Plaintiff in his care and under his control.

19.   NASSAR performed these procedures for many years, often times several times a week, on Plaintiff.

20.   NASSAR also had a very engaging personality and knew how to create an environment of friendliness, care, and false sense of security by joking with Plaintiff, asking her about school work, accepting friend requests on Facebook, requested that Plaintiff called him by his first name, ensuring her comfort in a caring manner, called her "sweet" and other niceties, talked about her potential suitors in the future, complimented her on her athletic ability, talked about his family and the struggles he was having with his disabled daughter, showed pictures of his family, and other endearing and personal conversations that engaged and drew Plaintiff to trust that he cared for her and that she was special.

21.   NASSAR also freely discussed his communication with other high-profile athletes around the world, those on the US Olympic Women's Gymnastics team, and phone calls with other physicians from around the world.  These conversations regularly reinforced his stature in the medical and sports community to draw Plaintiff and her parents to his trust.

22.    These relationship building skills allowed NASSAR to groom Plaintiff into submitting to sexual exploitation and keep the relationship in a state of Plaintiff believing she needed his assistance.

23.    Rather, NASSAR used his position of trust and confidence as a doctor in an abusive manner to sexually assault, batter, molest, and harass Plaintiff for his own gratification and personal pleasure.

24.    NASSAR also engaged in long conversations with Plaintiff's parents while they were in the room, manipulating and seeking to draw their attention away from his procedures.  NASSAR would face Plaintiff face-down and away from her parents to block and impede visual signals from Plaintiff and from the procedure.  Simultaneously, while Plaintiff was facing away from parent, NASSAR would also stand in-between parent and Plaintiff in order to not disclose procedures and block parent's view.

25.    NASSAR was often late to appointment with Plaintiff.  Upon entrance, NASSAR was rushed, would talk quickly, and create an environment of needing to rush Plaintiff into the procedures.  Often times NASSAR would not fully complete his treatment notes on his computer, ending sessions abruptly to exit the room to supposedly move to another patient.  NASSAR intentionally created an environment that would deflect his true intentions by rushing into the procedures, then out of appointments as soon as his procedures were completed.

26.    Plaintiff did not report NASSAR's inappropriate touchings since he intentionally created an environment of abuse and control.  Also, Plaintiff was a minor and was not able to comprehend or appreciate the nature of the abuse or even that she was being abused, even though NASSAR was causing her pain.  It was also reasonable for Plaintiff to trust her doctor, specifically when NASSAR was recognized as an international expert, was highly regarded in his profession,

was recommended by his peers, was invited into TWISTARS, was a part of USAG, and dealt with high-profile international athletes, including on the US Olympic Women's Gymnastics team.

27.    NASSAR referred Plaintiff to several other physicians that had full access to Plaintiff's medical records and knew NASSAR both professionally and personally.  In or around 2010 NASSAR referred Plaintiff to Dr. Michael Shingles and later that year referred Plaintiff to Dr. Ira Zaltz.  Both doctors sent Plaintiff back to NASSAR who perpetuated his assaults and abuse.

28.    Plaintiff ultimately moved from Michigan and NASSAR's visits ceased, although he initiated several communications with Plaintiff for a time after the move.  In the years thereafter, Plaintiff experienced severe depression, suicidal ideation, cutting, eating disorders, body image confusion, spiritual confusion, a distaste of normal or healthy sexual thoughts or appetite, and only seeking a male spouse that would not desire sex but rather have children by adoption or other methods.

29.    Plaintiff has been harmed and injured by NASSAR's inappropriate procedures, including, but not limited to, suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## JURISDICTION AND VENUE

30.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

31.   This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq., as more fully set forth herein.

32.   This is also an action to secure relief for violations of rights guaranteed by the Patient Protection and Affordable Care Act § 1557, 42 U.S.C. § 18116 (2012) ("Section 1557").

33.   Section 1557 of the Affordable Care Act prohibits discrimination in health care programs or activities, "any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency" or any entity established under Title I of the Affordable Care Act or its amendments.

34.   This Court has original jurisdiction over Plaintiff's claims arising under Section 1557.

35.   This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

36.   Subject matter jurisdiction is founded upon 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

37.   Subject matter jurisdiction is also founded upon 28 U.S.C. § 1332 as it relates to Plaintiff's claims against USAG for the reason that 28 U.S.C. § 1332 grants subject matter jurisdiction over civil actions involving citizens of different states where the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

38.   Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343, which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation,

custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

39.     Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

40.     The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 et seq., and under Michigan law.

41.     The majority of events giving rise to this lawsuit occurred in Ingham County, Michigan, which located in the Southern Division of the Western District of Michigan.

42.     Because MSU is a public university organized and existing under the laws of the State of Michigan, Michigan statutory law requires parties to file a Notice of Intention to File Claim in order to maintain any action against the state, in satisfaction of M.C.L. § 600.6431. Plaintiff filed a Notice of Intention to File Claim with the Michigan Court of Claims on August 3, 2018. See Exhibit 1.

## PARTIES AND FACTUAL ALLEGATIONS

43.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

44. Plaintiff's name has been withheld from this Complaint since she was a minor and resided in Michigan at all relevant times that she was had appointments with NASSAR or was associated with any Defendants.[1]

45. Plaintiff was a minor when each occurrence of sexual molestation, abuse, assault, touching, procedures, and treatment took place.

46. As to Defendant Dr. Lawrence "Larry" Nassar, upon information and belief:

   a. NASSAR, was a Doctor of Osteopathic Medicine and was a resident of Michigan at all relevant times.

   b. NASSAR graduated from Michigan State University with a Doctor of Osteopathic Medicine degree in or around 1993.

   c. NASSAR was employed by MSU from approximately 1996 to 2016 in various positions including but not limited to:

      i. Assistant and/or Associate Professor, MSU's Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine;

      ii. Team Physician for MSU's Men's and Women's Gymnastics Team;

      iii. Team Physician for MSU's Men's and Women's Track and Field Teams;

      iv. Team Physician for MSU's Men's and Women's Crew Team;

      v. Team Physician for MSU's Intercollegiate Athletics;

      vi. Medical Consultant for MSU's Wharton Center for the Performing Arts; and

      vii. Advisor for Student Osteopathic Association of Sports Medicine.

---

[1] Plaintiff will seek a Court Order regarding disclosure of Plaintiff's identity and all conditions for disclosure.

    d. NASSAR was employed by, or an agent of USAG from approximately 1986 to 2015, serving in various positions including but not limited to:

        i. Certified Athletic Trainer;

        ii. Osteopathic Physician;

        iii. National Medical Director;

        iv. National Team Physician, USA Gymnastics; and

        v. National Team Physician, USA Gymnastics Women's Artistic Gymnastics National Team.

    e. As a physician of osteopathic medicine, NASSAR's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment to patients, including students, student athletes of MSU, and private patients that sought treatment from NASSAR.

    f. NASSAR is not and has never been a medical doctor of obstetrics or gynecology.

    g. While employed by MSU and USAG, NASSAR sexually assaulted, abused, and molested numerous female patients by engaging in nonconsensual sexual assault, battery, molestation, and harassment, including, but not limited to, digital vaginal and anal penetration without the use of gloves or lubricant.

    h. The use of gloves when exposed to potentially infectious material, including vaginal secretion, is mandated by the State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Bloodborne Infectious Diseases.[2]

---

[2] See Michigan Administrative Code R. 325.70001 et seq., DEP'T OF LICENSING & REGULATORY AFFAIRS, available at:

i. NASSAR used his position of trust and confidence in an abusive manner to sexually assault, batter, molest, and harass female patients, including Plaintiff, over the course of his career for his own sexual self-gratification.

j. In late November 2016, NASSAR was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13, which is a felony punishable with a maximum penalty of imprisonment for life without the possibility of parole.[3]

k. On February 22, 2017, NASSAR was arraigned on 22 counts of first-degree criminal sexual conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual conduct with a person under the age of 13 years old in Ingham County, Michigan[4] and Eaton County, Michigan.[5]

l. On July 10, 2017, NASSAR plead guilty to the federal charges of possession of child pornography, receipt/attempted receipt of child pornography, and destruction and concealment of records and tangible objects.

m. On November 22, 2017, NASSAR plead guilty to 7 counts of first-degree criminal sexual conduct in Ingham County.

n. During his Ingham County plea, NASSAR admitted that his sexual assaults were not done for a medical purpose.

o. On November 29, 2017, NASSAR pleaded guilty to 3 counts of first degree criminal sexual conduct in Eaton County.

---

http:/jwww.michigan.gov/documents/CIS_WSH_part554_35632_7.pdf
(last visited Mar. 20, 2017).

[3] *People v. Nassar*, State of Michigan, Ingham County Circuit Court Case No. 17-143-FC.

[4] *People v. Nassar,* Ingham County District Court Case No. 17-00425-FY.

[5] *People v. Nassar,* Eaton County District Court Case No. 17-0318-FY.

p. On December 7, 2017, NASSAR was sentenced to a 720-months (60 years) prison term for the federal child pornography charges.

q. From, January 16, 2018, to January 24, 2018, a sentencing hearing was held in Ingham County for the 7 counts of first-degree criminal sexual conduct to which NASSAR pleaded guilty.

r. From January 31, 2018, to February 5, 2018, a sentencing hearing was held in Eaton County for the 3 counts of first degree criminal sexual conduct to which NASSAR pleaded guilty.

s. Dozens of Plaintiffs and many others provided victim impact statements at the Ingham County Sentencing and some of the Plaintiffs who were seeking to proceed anonymously in this litigation chose to publicly identify themselves at the sentencing hearing.

t. On January 24, 2018, NASSAR was sentenced to a 40 to 175-year prison terms for the Ingham County charges.

u. On February 5, 2018, NASSAR was sentenced to a 40 to 125-year prison term for the Eaton County charges.

v. NASSAR is currently an inmate in the custody of the Federal Bureau of Prisons at Coleman USP-2 in Sumterville, FL.

47. As to MSU Trustees, on information and belief, it is the governing body of Michigan State University, MSU. Brian Breslin is the current Chairman.

48. As to MSU, on information and belief, it all times during the allegations:

a. Was, and continues to be, a public university organized and existing under the laws of the State of Michigan. MSU also receives federal financial assistance and is

therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681(a).

b. Knew of many allegations that began in 1997 concerning NASSAR and continued during his tenure as an employee, representative, and/or agent.

c. Did not take corrective actions concerning allegations.

d. Did not discipline, suspend, or fire NASSAR but found he was reputable and allowed him to continue the practice of medicine and, through that venue, abuse.

49.   As to KOVAN, on information and belief, he is or was the Director of Division of Sports Medicine at MSU and CLINIC, and had direct supervisory duties over NASSAR.  At all relevant times KOVAN maintained an office at CLINIC and was acting under color of law, statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU.

50.   As to DIETZEL, on information and belief, he is or was the Clinical Director of MSU Sports Medicine and CLINIC, and at all relevant times was serving in that capacity, and has also served as Team Orthopedic Surgeon for MSU Department of Intercollegiate Athletics. DIETZEL maintained an office at MSU, was acting under color of law, statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU, and had direct supervisory duties over NASSAR.

51.   As to STRAMPEL, on information and belief, he was at all relevant times the Dean of the College of Osteopathic Medicine at MSU.  STRAMPEL maintained an office at MSU, was acting under color of law, statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU, and had direct supervisory duties over NASSAR.

52. As to STOLLAK, on information and belief, he was a MSU clinical psychologist and Professor of Psychology. At all relevant times STOLLAK maintained an office at MSU and was acting under color of law, statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU.

53. As to SHINGLES, on information and belief, he was a MSU Team Orthopedic Surgeon at CLINIC. At all relevant times SHINGLES maintained an office at MSU and was acting under color of law, statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU. SHINGLES conferred with NASSAR, reviewed NASSAR's files on Plaintiff, and neglected to report NASSAR's abuse as required.

54. As to ZALTZ, on information and belief, he was and is a board certified Orthopaedic surgeon who specializes in children's orthopaedic conditions, employed at all relevant times by Oakland Orthopaedic Surgeons in Royal Oaks, Michigan. ZALTZ conferred with NASSAR, reviewed NASSAR's files on Plaintiff, and neglected to report NASSAR's abuse as required.

55. USAG, on information and belief, was and continues to be an organization incorporated in Indiana, authorized to conduct business and conducting business throughout the United States, including but not limited to Michigan.

56. TWISTARS, on information and belief, was and continues to be an organization incorporated under the laws of Michigan. At all relevant times, John Geddert was the owner and president of TWISTARS. TWISTARS invited NASSAR into their club and encouraged gymnasts to see NASSAR for their injuries. The gymnasts were invitees to, and had contracts for services with, TWISTARS. NASSAR was under the supervision of TWISTARS when he was an employee, representative, and/or agent to their premises and club.

**COUNT I**

-16-

## VIOLATIONS OF TITLE IX
### 20 U.S.C. §1681(a), et seq.
### PLAINTIFF AGAINST MSU AND MSU TRUSTEES

57.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

58.    Title IX's statutory language states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance …" [6]

59.    "Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities." [7]

60.    Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature. "It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature." [8]

61.    Plaintiff is a "person" within the meaning of 20 U.S. C. §1681(a).

62.    MSU receives financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S. C. § 1681, et seq.

63.    MSU is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

---

[6] 20 U.S.C. §1681(a), *et seq.  See generally*, U.S. Dept. of Ed., Office of Civil Rights, Dear Colleague Letter: Sexual Violence, April 4, 2011, n. 11 ("Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities."). Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.  Last accessed September 2, 2018.

[7] *ld*. At 4.
[8] *ld*. At 3.

64. The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

65. NASSAR's actions and conduct were carried out under one of MSU's programs, which provides medical treatment to students, athletes, and the public.

66. NASSAR's conduct and actions toward Plaintiff, that being nonconsensual touching of Plaintiff's vaginal and anal areas, and unwelcome sexual or otherwise inappropriate touching of Plaintiff's body, constitutes sex discrimination under Title IX.

67. NASSAR's sexual assault, battery, molestation, and harassment of Plaintiff constituted sexual discrimination and harassment under Title IX.

68. Pursuant to Title IX, MSU is obligated and required to investigate all allegations of sexual assault, battery, molestation, and harassment, including allegations that sexual assault, battery, molestation, and harassment has been committed by an employee, student, or third party.

69. MSU owed Plaintiff duties under Title IX, which duties included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, and other sexual misconduct.

70. Upon information and belief, an "appropriate person" at MSU, within the meaning of Title IX, and including but not limited to trainers, coaches, and Kathie Klages, had actual and constructive notice of sexual assault, battery, molestation, and harassment committed by NASSAR as early as 1997, and includes multiple reports and allegations that MSU knew or should have known and did not appropriately take action to correct.

71.     Examples of MSU's knowledge of NASSAR's abuse, based upon information and belief, are numerous.   Some examples that MSU was directly informed abuse was taking place are:

      a.   Coach Klages by plaintiffs Larissa Boyce and Jane B8 Doe in or around 1997/1998;

      b.   Kelli Bert by plaintiff Christie Achenbach in or around 1999;

      c.   Destiny Teachnor-Hauk by Tiffany Thomas Lopez in 2000 on more than one occasion;

      d.   Lianna Hadden by plaintiff Jennifer Rood Bedford between approximately 2000 and 2002;

      e.   STOLLAK in 2004 by plaintiff Kyle Stephens; and,

      f.   KOVAN in or around 2014 by plaintiff Jane D1 Doe (collectively, "MSU ALLEGATIONS").

72.     MSU, by its nonaction of previously reported allegations, violated the reporting policies and procedures and Title IX and was done in a manner that was reckless, grossly negligent, and deliberately indifferent.

73.     MSU Defendants failed to carry out their duties to investigate and take corrective action under Title IX.

74.     MSU acted with indifference and in a clearly unreasonable manner by failing to respond to the allegations of sexual assault, abuse, and molestation in light of the known circumstances, NASSAR's conduct toward female athletes, and his access to young girls and young women.

75.   The MSU's deliberate indifference is further confirmed by the Department of Education's 2014 investigation into MSU's handling of sexual assault and relationship violence allegations, which revealed:

76.   That the MSU's failure to adequately respond to allegations of sexual assault created a sexually hostile environment and affected numerous students and staff on MSU's campus, which includes the CLINIC;

77.   That the MSU's failure to address complaints of sexual violence in a prompt and equitable manner caused and may have contributed . . . to a continuation of the sexually hostile environment. [9]

78.   The MSU's responses were clearly unreasonable as NASSAR continued to sexually assault female athletes and other individuals until he was discharged from the University in 2016.

79.   MSU had actual and constructive knowledge of, but were recklessly and deliberately indifferent to, NASSAR's sexual assault, battery, molestation, and harassment in between 1997 and/or 1998 and 2016.

80.   MSU's failure to properly and appropriately investigate and take corrective action for the 1997 and later complaints of NASSAR's sexual assault, battery, molestation, and harassment resulted in Plaintiff being subject to further sexual assault, battery, molestation, harassment, and a sexually hostile environment, and created an increased environment of danger to Plaintiff, effectively denying her access to medical care.

---

[9] *Letter from U.S. Department of Education*, Office for Civil Rights to Michigan State University, OCR Docket #15-11-2098, #15-14-2113 (Sept. 1, 2015), https://fwww2.ed.gov/documents/press-releases/michigan-state-letter.pdf. 25

81.   MSU's responses to the complaints in 1997 and later were clearly unreasonable as NASSAR continued to sexually assault young females, including Plaintiff, until he was discharged from the University in 2016.

82.   MSU failed to offer counseling services to current or former patients of NASSAR, including Plaintiff.

83.   MSU failed to notify Plaintiff of potential sexual misconduct and harassment as outlined in its own policies.

84.   As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT II
### VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983
### PLAINTIFF AGAINST MSU, MSU BOARD OF TRUSTEES, NASSAR, STRAMPEL, KOVAN, DIETZEL, AND STOLLAK

85.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

86.   MSU, MSU BOARD OF TRUSTEES, STRAMPEL, KOVAN, DIETZEL, and STOLLAK shall be referred to collectively as MSU Defendants in addition to any individual reference.

87.   Plaintiff, as a female, is a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States.

88.    Plaintiff enjoys the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, battery, molestation, and harassment.

89.    At all relevant times, the MSU Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU.

90.    The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the MSU's position should have known.

91.    The MSU Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice failed to do so with deliberate indifference.

92.    As a matter of custom, policy, and/or practice, the MSU Defendants have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to, students, visitors, faculty, staff, or other employees, agents, and representatives, and failed to do so with deliberate indifference.

93.    The MSU Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

94.    MSU's internal policies provide that "[a]ll University employees . . . are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property."  They further provide that "[t]he employee must report

all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event." [10]

95.    This policy was violated in or around 1997 and with other later sexual allegations and complaints as previously address in this Complaint.  See MSU ALLEGATIONS in this Complaint.

96.    MSU Defendants have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, patients, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

97.    These policies and responsibilities were continuously violated and disregarded by MSU Defendants throughout the investigations, allegations, and complaints of MSU ALLEGATIONS, continuously allowing a "sexually hostile environment to exist."[11]

98.    MSU Defendants are also liable to Plaintiff under 42 U.S.C. § 1983 for maintaining customs, policies, practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

99.    MSU Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline NASSAR, with the result that NASSAR continued to violate the rights of persons such as Plaintiff with impunity.

100.    MSU Defendants failed to warn or advise current and former patients of NASSAR, including Plaintiff, that allegations could surface that, in fact, the treatment that the patients received was not medical treatment at all, but was sexual assault.  This violated MSU's policies

---

[10] *Michigan State University, University Policy on Relationship Violence & Sexual Misconduct*, MSU STUDENT RES., at 19-20.
[11] See Complaint, line 77.

and handbook and MSU Defendant's inaction subjected Plaintiff to NASSAR's continuous sexual abuse.

101. As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT III
### FAILURE TO TRAIN AND SUPERVISE 42 U.S.C. § 1983
### PLAINTIFF AGAINST MSU DEFENDANTS

102. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

103. MSU Defendants have the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives, including NASSAR and all faculty and staff, regarding their duties toward students, faculty, staff, and visitors.

104. MSU Defendants failed to train and supervise its employees, agents, and/or representatives, including all faculty and staff, regarding the following duties, although not exhaustive:

    a. Perceive, report, and stop inappropriate sexual conduct on campus;

    b. Provide diligent supervision over student-athletes and other individuals;

    c. Report suspected incidents of sexual abuse or sexual assault;

    d. Ensure the safety of all students, faculty, staff, and visitors to MSU's campuses premises;

    e.   Provide a safe environment for all students, faculty, staff, and visitors to MSU's premises free from sexual harassment; and,

    f.   Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

105.  The MSU Defendants and their employees, agents, and/or representatives had a duty to report suspected sexual abuse.

106.  The MSU Defendants and their employees, agents, and/or representatives failed to report sexual abuse about which they knew or should have known.

107.  The MSU Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the above duties which led to violations of Plaintiff's rights.

108.  MSU Defendants' failure to adequately supervise or investigate NASSAR, especially after MSU Defendants knew, or should have known, of complaints regarding his nonconsensual sexual touching and assaults during "treatments" through the MSU ALLEGATIONS, was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

109.  At no time during or following the MSU ALLEGATIONS' investigation did MSU Defendants take any steps to ensure NASSAR was in compliance with guidelines, which was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to young athletes.

110.  As a result, the MSU Defendants deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

111.  As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock,

emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT IV
### GROSS NEGLIGENCE
### PLAINTIFF AGAINST MSU DEFENDANTS, NASSAR, SHINGLES, AND ZALTZ

112. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

113. MSU Defendants owed Plaintiff a duty of ordinary care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including NASSAR.

114. NASSAR and SHINGLES, as employees, agents, and/or representatives of the MSU Defendants, and ZALTZ, individually, owed Plaintiff a duty to use ordinary care in providing medical treatment.

115. NASSAR, MSU Defendants, SHINGLES, and ZALTZ owed Plaintiff a duty to use due care as a special, confidential, and fiduciary relationship was created between Plaintiff and NASSAR, between Plaintiff and SHINGLES, and between Plaintiff and ZALTZ, when Plaintiff sought medical treatment from NASSAR, in the course of his employment, agency, and/or representation of the MSU Defendants, and from SHINGLES and ZALTZ, individually.

116. SHINGLES, ZALTZ, and MSU Defendants, and their employees, agents, and/or representatives, had a duty to report suspected sexual abuse.

117. SHINGLES, ZALTZ, and MSU Defendants, and their employees, agents, and/or representatives, failed to report sexual abuse about which they knew or should have known.

118. The MSU Defendants' failure to adequately supervise NASSAR, especially after the MSU Defendants knew or should have known of complaints regarding NASSAR's conduct, was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff.

119. NASSAR's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of the MSU Defendants under the guise of proper medical treatment was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff.

120. NASSAR's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of the MSU Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiff.

121. MSU Defendants' conduct and the conduct of their individual employees and agents demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

122. MSU Defendants knew, or should have known, of complaints pertaining to NASSAR's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment.

123. SHINGLES knew or should have known of NASSAR's nonconsensual sexual touching and assaults by his full review of Plaintiff's medical records after being referred by NASSAR, and because SHINGLES worked intimately with NASSAR in the same office, had a personal and professional relationship with NASSAR, and knew or should have known MSU ALLEGATIONS against NASSAR.

124.  ZALTZ knew or should have known of NASSAR's nonconsensual sexual touching and assaults by his full review of Plaintiff's medical records after being referred by NASSAR, was intimately knowledgeable of MSU, CLINIC, and NASSAR, and knew or should have known MSU ALLEGATIONS against NASSAR.  ZALTZ should have done a full investigation of Plaintiff's records and inquired into what "manual manipulations" were being performed on Plaintiff, thereby, discovering the abuse.

125.  MSU Defendants' conduct demonstrated a willful disregard by not implementing precautions to ensure Plaintiff's safety which caused a substantial risk to Plaintiff, and lead to ultimate harm to Plaintiff.

126.  SHINGLES, ZALTZ, and MSU Defendants breached duties owed to Plaintiff and were grossly negligent when they conducted themselves in the manner described above. These acts, and omissions of required acts, by SHINGLES, ZALTZ, and MSU Defendants were committed with reckless disregard to Plaintiff's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to Plaintiff.

127.  SHINGLES and MSU Defendants failed to warn or advise current and former patients of NASSAR, including Plaintiff, that allegations could surface that, in fact, the treatment that the patients received was not medical treatment at all but was potentially sexual assault.

128.  MSU Defendants failed to offer counseling services to current or former patients of NASSAR, including Plaintiff.

129. As a direct and proximate result of the SHINGLES', ZALTZ's, and MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation,

enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

**COUNT V**
**NEGLIGENCE**
**PLAINTIFF AGAINST MSU DEFENDANTS, SHINGLES, ZALTZ, AND NASSAR**

130. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

131. MSU Defendants owed Plaintiff a duty to use ordinary and expected care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including SHINGLES and NASSAR.

132. SHINGLES, ZALTZ, NASSAR, and MSU Defendants owed Plaintiff a duty to use ordinary care as a special, confidential, and fiduciary relationship was created between Plaintiff and NASSAR when Plaintiff sought medical treatment from SHINGLES, ZALTZ, and NASSAR.

133. SHINGLES, ZALTZ, NASSAR, and MSU Defendants owed Plaintiff a duty to use ordinary care in their undertakings.

134. SHINGLES, ZALTZ, and MSU Defendants, and their employees, agents, and/or representatives had a duty to report suspected sexual abuse.

135. SHINGLES, ZALTZ, and MSU Defendants and their employees, agents, and/or representatives, failed to report sexual abuse about which they knew or should have known when having full access to Plaintiff's medical records and working intimately and regularly with NASSAR.

136. MSU Defendants' failure to adequately train and supervise NASSAR breached the duty of ordinary care.

137.  SHINGLES and MSU Defendants had notice of complaints of a sexual nature related to NASSAR's purported treatment with young girls and women through MSU's employees, agents, and/or representatives through the MSU ALLEGATIONS.

138.  SHINGLES and MSU Defendants knew or should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports athletes.

139.  MSU Defendants' failure to properly address, investigate, and remedy complaints against NASSAR's conduct was a breach of the duty to use ordinary care.

140.  NASSAR's conduct in sexually assaulting, battering, molesting, and harassing Plaintiff in the course of his employment, agency, and/or representation of MSU Defendants under the guise of medical treatment was a breach of the duty to use ordinary care.

141.  MSU Defendants and SHINGLES failed to warn or advise current and former patients of NASSAR, including Plaintiff, that allegations did, have, and could surface that, in fact, the treatment that the patients received was not medical treatment but was potentially sexual assault.

142.  MSU Defendants controlled all medical records and NASSAR's records of victims and MSU Defendants did nothing to inform victims, including Plaintiff, of their potential rights of being a victim of sexual abuse.

143.  The MSU Defendants failed to offer counseling services to current or former patients of NASSAR, including Plaintiff.

144.  As a direct and proximate result of SHINGLES', ZALTZ's, and MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life,

has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT VI
## VICARIOUS LIABILITY
## PLAINTIFF AGAINST MSU, MSU BOARD OF TRUSTEES, AND CLINIC

145. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

146. Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

147. Vicarious liability creates agency between the principal and its agent so that the principal is held to have done what the agent has done.

148. MSU, MSU TRUSTEES, and CLINIC employed and/or held NASSAR out to be its agent and/or representative from approximately 1996 to 2016.

149. MSU's website, during NASSAR's tenure of employment, agency, and/or representation of MSU, contained hundreds of web pages portraying NASSAR as a distinguished member of MSU's College of Osteopathic Medicine, Division of Sports Medicine.

150. MSU, MSU TRUSTEES, and CLINIC are vicariously liable for the actions of NASSAR, as described above, that were performed during the course of his employment, agency, and/or representation with MSU and CLINIC and while he had unfettered access to young female athletes on MSU's campus and premises through its College of Osteopathic Medicine and Division of Sports Medicine, and at all times NASSAR was acting as an employee and/or agent for MSU and CLINIC who possessed and exercised control over NASSAR.

151.  MSU, MSU TRUSTEES, and CLINIC failed to prevent their employee and/or agent, NASSAR, from continuing to perpetuate his sexual deviancy and abuse of female patients, including against Plaintiff.

152.  MSU, MSU TRUSTEES, and CLINIC had actual and/or constructive knowledge of NASSAR's propensity for sexually assaulting, battering, molesting, and harassing his patients and other females under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with MSU, MSU TRUSTEES, and CLINIC and took no action to prevent such conduct.

153.  It was reasonably foreseeable that NASSAR would continue to sexually assault, batter, molest, and harass females (under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with the MSU Defendants) with the actual and/or constructive knowledge MSU, MSU TRUSTEES, and CLINIC had of such conduct.

154.  As a direct and proximate result of MSU's, MSU TRUSTEE's, and CLINIC's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT VII
### EXPRESS/IMPLIED AGENCY
### PLAINTIFF AGAINST MSU DEFENDANTS

155.  Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

156.  An agent is a person who is authorized by another to act on its behalf.

157. MSU Defendants intentionally and/or negligently made representations that NASSAR was their employee, agent, and/or representative.

158. On the basis of those representations, Plaintiff reasonably believed that NASSAR was acting as an employee, agent, and/or representative of the MSU Defendants.

159. Plaintiff was injured as a result of NASSAR's sexual assault, abuse, and molestation, as described above. These acts were performed during the course of NASSAR's employment, agency, and/or representation with the MSU Defendants while he had access to young females.

160. Plaintiff was injured because she relied on the MSU Defendants to provide employees, agents, and representatives who exercise reasonable skill and care.

161. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT VIII
### NEGLIGENT SUPERVISION
### PLAINTIFF AGAINST MSU DEFENDANTS

162. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

163. MSU Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, NASSAR, while he was in the course of his employment, agency, and/or representation with the MSU Defendants and while he interacted with young females, including Plaintiff.

164. Given the known sexual abuse in youth sports and gymnastics and the MSU ALLEGATIONS, it was reasonably foreseeable that NASSAR, who had prior allegations against him, had and/or would sexually abuse young females, including Plaintiff, unless properly supervised.

165. MSU Defendants by and through their employees, agents, representatives, managers, and/or assigns, such as Kathie Klages, President Simon, President McPherson, Dean Strampel, and/or Dr. Kovan, knew or reasonably should have known of NASSAR's conduct and/or that NASSAR was an unfit employee, agent, and/or representative because of his sexual interest in children and his sexual deviancy towards women of all ages.

166. MSU Defendants breached their duty to provide reasonable supervision of NASSAR, and permitted NASSAR, who was in a position of trust and authority, to commit acts against Plaintiff.

167. The above sexual assault, abuse, and molestation occurred while Plaintiff and NASSAR were on the premises of MSU and while NASSAR was in the course of his employment, agency, and/or representation with the MSU Defendants.

168. MSU Defendants tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in the allowance of NASSAR to violate the rights or persons such as Plaintiff with impunity.

169. MSU Defendants failed to warn or advise current and former patients of NASSAR, including Plaintiff, that allegations could surface that, in fact, the treatment that the patients received was not medical treatment at all but was potentially sexual assault.

170. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

### COUNT IX
### NEGLIGENT FAILURE TO WARN AND/OR PROTECT
### PLAINTIFF AGAINST MSU PLAINTIFF AND SHINGLES

171. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

172. MSU Defendants and SHINGLES knew or should have known that NASSAR posed a risk of harm to Plaintiff and/or others in Plaintiff's situation.

173. MSU Defendants and SHINGLES knew or should have known that NASSAR committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

174. As early as 1997 and/or 1998, and by way of MSU ALLEGATIONS, MSU Defendants had direct and/or constructive knowledge of NASSAR's dangerous conduct and failed to respond reasonably and responsibly.

175. SHINGLES knew or should have known of MSU ALLEGATIONS by working closely and intimately with NASSAR in CLINIC for numerous years.

176. MSU Defendants and SHINGLES had a duty to warn or protect Plaintiff and others in Plaintiff's situation against the risk of injury by NASSAR.

177. The special, trusting, confidential, and fiduciary relationship between Plaintiff and NASSAR and between Plaintiff and SHINGLES, as an employee, agent, and/or representative of

the MSU Defendants, created a duty for MSU Defendants and SHINGLES to disclose information regarding NASSAR's sexual conduct.

178. The MSU Defendants and SHINGLES breached the duty owed to Plaintiff by failing to warn Plaintiff and/or by failing to take reasonable steps to protect Plaintiff from NASSAR.

179. The MSU Defendants breached the duties to protect owed to Plaintiff by failing to:

    a. Respond to allegations of sexual assault, abuse, and molestation;

    b. Detect and/or uncover evidence of sexual assault, abuse, and molestation; and

    c. Investigate, adjudicate, and terminate NASSAR's employment with MSU prior to 2014.

180. MSU Defendants violated Plaintiff's rights by failing to adequately screen, counsel, and/or discipline NASSAR for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in a violation of Plaintiff's rights.

181. SHINGLES violated Plaintiff's rights by failing to adequately report NASSAR to MSU Defendants and to Plaintiff knowing NASSAR's background and propensities due to MSU ALLEGATIONS.

182. The MSU Defendants and SHINGLES willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from NASSAR's conduct.

183. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from

obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

**COUNT X**
**NEGLIGENT FAILURE TO REPORT ABUSE**
**PLAINTIFF AGAINST STRAMPLE, KOVAN, DIETZEL, STOLLAK,**
**SHINGLES, AND ZALTZ**

184. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

185. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ negligently failed to report suspected abuse and neglect under MCL 722.623 which provides, in pertinent part, as follows:

> (1) An individual is required to report under this act as follows:
>
> > (a) A physician, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, person licensed to provide emergency medical care, audiologist, psychologist, marriage and family therapist, licensed professional counselor, social worker, licensed master's social worker, licensed bachelor's social worker, registered social service technician, social service technician, a person employed in a professional capacity in any office of the friend of the court, school administrator, school counselor or teacher, law enforcement officer, member of the clergy, or regulated child care provider who has reasonable cause to suspect child abuse or neglect shall make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of the suspected child abuse or neglect to the department.

186. MCL 722.622 defines child abuse and child neglect as follows:

> (f) "Child abuse" means harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy.
> * * *
>
> (j) "Child neglect" means harm or threatened harm to a child's health or welfare by a parent, legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following:

(i) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care.

(ii) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk.

187. MCL 722.633 sets forth the liability for failure to report:

(1) A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure.

(2) A person who is required by this act to report an instance of suspected child abuse or neglect and who knowingly fails to do so is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00, or both.

188. NASSAR, SHINGLES, and ZALTZ were non-parent adults who were responsible for Plaintiff's health and welfare, had substantial contact with Plaintiff, and was not the Plaintiff's parent or a person otherwise related to the child. See MCL 722.622(v)).

189. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ owed Plaintiff a duty to use ordinary and expected care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including NASSAR.

190. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ owed Plaintiff a duty to use ordinary care as a special, confidential, and fiduciary relationship was created between Plaintiff and NASSAR when Plaintiff sought medical treatment from SHINGLES, ZALTZ, and NASSAR.

191. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ owed Plaintiff a duty to use ordinary care in their undertakings.

192. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ, and their employees, agents, and/or representatives had a mandatory duty to report suspected child abuse.

193. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ and their employees, agents, and/or representatives, failed to report such abuse about which they knew, should have known, and should have reasonably suspected when having full access to Plaintiff's medical records and working intimately and regularly with NASSAR.

194. STRAMPEL, KOVAN, DIETZEL, STOLLAK, and SHINGLES had notice of complaints of a sexual nature related to NASSAR's purported treatment with young girls and women through MSU's employees, agents, and/or representatives through the MSU ALLEGATIONS.

195. STRAMPEL, KOVAN, DIETZEL, STOLLAK, and SHINGLES knew or should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports athletes.

196. NASSAR's conduct in sexually assaulting, battering, molesting, and harassing Plaintiff in the course of his employment, agency, and/or representation of MSU Defendants under the guise of medical treatment was a breach of the duty to use ordinary care.

197. STRAMPEL, KOVAN, DIETZEL, STOLLAK, and SHINGLES were employed by MSU and CLINIC and failed to warn or advise current and former patients, including Plaintiff, of NASSAR that allegations did, have, and could surface that, in fact, the treatment that the patients received was not medical treatment but was potentially sexual assault.

198. MSU Defendants controlled all medical records and NASSAR's records of victims and MSU Defendants did nothing to inform victims, including Plaintiff, of their potential rights of being a victim of sexual abuse.

199. STRAMPEL, KOVAN, DIETZEL, STOLLAK, SHINGLES, and ZALTZ are directly and civilly liable for the damages proximately caused by their failure to report any instance of suspected child abuse and/or neglect. MSU, MSU Trustees, and CLINIC are vicariously liable for such damages and neglect.

200. As a direct and proximate result of STRAMPEL's, KOVAN's, DIETZEL's, STOLLAK's, SHINGLES', and ZALTZ's actions and inactions, and MSU Defendants' vicariously liability, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XI
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE
## PLAINTIFF AGAINST MSU DEFENDANTS

201. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

202. MSU Defendants had a duty to take reasonable protective measures to protect Plaintiff and others in Plaintiff's situation against the risk of injury by NASSAR.

203. MSU Defendants breached the duty owed to Plaintiff to take reasonable protective measures to protect Plaintiff, and other patients of NASSAR, by failing to properly train or educate Plaintiff and other individuals in Plaintiff's situation, about how to avoid a risk of sexual assault and/or sexual abuse by NASSAR.

204. MSU Defendants failed to implement reasonable safeguards to:

    a. Prevent acts of sexual assault, abuse, and molestation by NASSAR; and

b. Avoid placing NASSAR in positions where he would have unsupervised contact and interaction with Plaintiff and other children and young women.

205. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XII
## NEGLIGENT RETENTION
## PLAINTIFF AGAINST MSU DEFENDANTS

206. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

207. The MSU Defendants owed a duty to Plaintiff and others in Plaintiff's situation when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents, and/or representative to exercise due care.

208. MSU Defendants breached the duties owed to Plaintiff by failing to adequately investigate, report, and address complaints about NASSAR's conduct, which MSU Defendants knew or should have known.

209. MSU Defendants breached the duties owed to Plaintiff when the MSU Defendants retained NASSAR as an employee, agent, and/or representative after the MSU Defendants discovered or should have reasonably discovered NASSAR's conduct, which reflected a propensity for sexual misconduct.

210. MSU Defendants' failure to act in accordance with the standard of care resulted in NASSAR gaining access to and sexually assaulting and/or sexually abusing Plaintiff and an unknown number of other individuals.

211. The above conduct of MSU Defendants in credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of NASSAR created a foreseeable risk of harm to Plaintiff and other minors and young adults.

212. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## PLAINTIFF AGAINST MSU DEFENDANTS

213. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

214. MSU Defendants allowed NASSAR to be in a position where he could sexually assault, abuse, and molest children and young adults.

215. A reasonable person would not expect MSU Defendants to tolerate or permit an employee, agent, and/or representative to carry out sexual assault, abuse, or molestation after MSU Defendants knew or should have known of complaints and claims of sexual assault and abuse occurring during NASSAR's "treatments."

216. MSU Defendants held NASSAR in high esteem and acclaim, which encouraged Plaintiff and others to respect and trust NASSAR and seek out his services without questioning his motives or methods.

217. MSU Defendants protected NASSAR in part to bolster and sustain his national and international reputation in the gymnastics community.

218. A reasonable person would not expect MSU Defendants to be incapable of supervising NASSAR and/or preventing NASSAR from conducting acts of sexual assault, abuse, and molestation.

219. By protecting NASSAR and encouraging the perpetuation of his reputation, the MSU Defendants acted in a way that was beyond all possible bounds of decency in failing to protect Plaintiff and other minors and young adults from NASSAR's conduct.

220. MSU Defendants' conduct as described above was intentional and/or reckless.

221. MSU Defendants' action and inaction constitutes extreme and outrageous conduct.

222. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

### COUNT XIV
### FRAUD AND MISREPRESENTATION
### PLAINTIFF AGAINST MSU DEFENDANTS

223. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

224. From approximately 1996 to September 2016, MSU Defendants represented to Plaintiff and the public that NASSAR was a competent, safe, and highly regarded physician.

225. By representing, including on MSU's website, that NASSAR was a team physician and athletic physician at MSU, and a National Team Physician with USAG, MSU Defendants represented to Plaintiff and the public that NASSAR was safe, trustworthy, and of high moral and ethical repute and that Plaintiff and the public could readily utilize the services of NASSAR without being harmed.

226. The above representations regarding NASSAR's purported character were false when they were made, because NASSAR had and was continuing to sexually assault, abuse, and molest an unknown number of patients, including Plaintiff, and other individuals.

227. MSU Defendants knew the above representations regarding NASSAR were false because there had been previous complaints in 1997 and later through MSU ALLEGATIONS to MSU employees, agents, and/or representatives about NASSAR's sexual assault, battery, molestation, and harassment.

228. Although MSU had been informed of NASSAR's conduct MSU Defendants failed to investigate, remedy, or in any way address the MSU ALLEGATIONS against NASSAR.

229. MSU Defendants continued to portray NASSAR as a competent and safe physician.

230. NASSAR was permitted to continue his employment, and thereby, sexually assault, abuse, and molest Plaintiff and an unknown number of other individuals, despite numerous complaints to MSU.

231. MSU Defendants disregarded complaints because of MSU's culture, which included existence of a sexually hostile environment on MSU's campus and premises and MSU's failure to

address complaints of sexual harassment, including sexual violence, in a prompt and equitable manner, which ultimately perpetuated the hostile environment.

232.  Plaintiff trusted and relied on MSU Defendants' portrayal of NASSAR when she sought his medical treatment for her injury.

233.  Plaintiff and other members of the public trusted and relied on the assertions of MSU Defendants and several other young females continued to seek medical treatment from NASSAR in the wake of known concerns and dangers.

234.  Up until 2016, MSU Defendants continued to portray NASSAR as a safe and competent physician.

235.  MSU Defendants, by and through their representatives, also affirmatively took steps to attempt to dissuade victims from speaking with police about their complaints against NASSAR.

236.  MSU Defendants, by and through their representatives, also affirmatively took steps to attempt to dissuade other potential victims of NASSAR from speaking with police or the media, by advising the potential victims to respond "No comment" to any requests by media or police.

237.  These actions of MSU Defendants were purportedly done as an attempt to hide the known instances of sexual abuse committed by NASSAR.

238.  MSU Defendant controlled all of Plaintiff's medical records and all other of NASSAR's victims.

239.  MSU Defendant refused to notify Plaintiff and other NASSAR victims of NASSAR's continued abuse and exploitation of girls and women, during NASSAR's tenure as an employee and/or agent, and after known facts and new allegations came forward in 2016 and later.

240.  Even after NASSAR being prosecuted and admitting sexual abuse, MSU Plaintiff still has not come forward to known and expected victims of NASSAR and have fraudulently

hidden facts, records, and all other aspects of NASSAR's crimes and have continually concealed NASSAR's and MSU Plaintiff's actions and inactions.

241. Plaintiff attended USAG sanctioned events and competitions at which NASSAR and CLINIC staff provided medical care.

242. As a result of Plaintiff's and the public's trust and reliance on MSU Defendants' fraudulent misrepresentations regarding NASSAR, Plaintiff and others in Plaintiff's situation were sexually assaulted, abused, and molested by NASSAR during appointments.

243. As a direct and proximate result of MSU Defendants' actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## PLAINTIFF'S COUNTS AGAINST USAG

### COUNT XV
### GROSS NEGLIGENCE

244. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

245. A special, confidential, and fiduciary relationship was created between Plaintiff and NASSAR when Plaintiff sought medical treatment from NASSAR, acting in the course of his employment, agency, and/or representation of USAG, and resulting in NASSAR owing Plaintiff a duty to use due care.

246.  NASSAR owed Plaintiff a duty to use due care in providing medical treatment as an employee, agent, and/or representative of USAG.

247.  USAG owed the public and Plaintiff a duty to use due care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with its employees, representatives, and/or agents, including NASSAR.

248.  USAG knew or should have known of complaints pertaining to NASSAR's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment.

249.  NASSAR's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of USAG under the guise of proper medical treatment was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff.

250.  USAG's failure to adequately supervise NASSAR was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff.

251.  USAG's conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

252.  USAG's conduct demonstrated a willful disregard for substantial risks to Plaintiff.

253.  USAG breached its duties owed to Plaintiff, and was grossly negligent when it conducted itself in the manner described above, including, but not limited to, failing to notify MSU about the reasons for NASSAR's separation from USAG in 2015 and, more broadly, the issues surrounding sexual abuse and warning signs and reporting requirements.

254.  These acts by USAG were committed with reckless disregard to Plaintiff's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to Plaintiff.

255. As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XVI
## NEGLIGENCE

256. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

257. Plaintiff attended USAG sanctioned events and competitions at which NASSAR and CLINIC staff provided medical care.

258. A special, confidential, and fiduciary relationship was created between Plaintiff and NASSAR when Plaintiff sought medical treatment from NASSAR in the course of his employment, agency, and/or representation of USAG, resulting in NASSAR owing Plaintiff a duty to use ordinary care.

259. NASSAR owed Plaintiff a duty to use ordinary care in providing medical treatment.

260. USAG owed the public and Plaintiff a duty to use ordinary care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including NASSAR.

261. NASSAR's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of USAG under the guise of proper medical treatment was a breach of the duty to use ordinary care.

262. USAG's failure to adequately train and supervise NASSAR breached the duty of ordinary care.

263. USAG's failure to properly investigate, address, and remedy complaints regarding NASSAR's conduct was a breach of ordinary care.

264. USAG's failure to inform the public, including individuals USAG had referred to NASSAR for treatment, of the allegations leading to NASSAR's separation for USAG was a breach of ordinary care.

265. NASSAR's conduct in sexually assaulting, abusing, and molesting Plaintiff was a breach of the duty to use ordinary care.

266. As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XVII
## VICARIOUS LIABILITY

267. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

268. Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

269.  Vicarious liability essentially creates agency between the principal and its agent so that the principal is held to have done what the agent has done.

270.  USAG's website, during NASSAR's tenure of employment, agency, and/or representation of USAG, contained sites portraying NASSAR as the recipient of distinguished awards and boasts him as having been instrumental to the success of USA gymnastics.

271.  USAG employed and/or held NASSAR out to be its agent and/or representative from approximately 1986 to 2015.

272.  USAG is vicariously liable for the actions of NASSAR, as described above, that were performed during the course of his employment, representation, and/or agency with USAG.

273.  USAG had actual and/or constructive knowledge of NASSAR sexually assaulting, battering, molesting, and harassing young females on several occasions under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with USAG, beginning in 1997 and/or 1998.

274.  USAG had actual and/or constructive knowledge of NASSAR's propensity for sexually assaulting, battering, molesting, and harassing his patients and other females under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with USAG, beginning in 1997 and/or 1998.

275.  It was reasonably foreseeable that NASSAR would continue to sexually assault, batter, molest, and harass females (under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with the USAG) with the actual and/or constructive knowledge USAG had of such conduct.

276.  As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress,

anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XVIII
## EXPRESS/IMPLIED AGENCY

277.  Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

278.  An agent is a person who is authorized by another to act on its behalf and USAG intentionally and/or negligently made representations that NASSAR was its employee, agent, and/or representative.

279.  On the basis of those representations, Plaintiff reasonably believed that NASSAR was acting as an employee, agent, and/or representative of USAG.

280.  Upon information and belief, USAG referred significant numbers of gymnasts to NASSAR for medical treatment at his office on MSU's campus.

281.  Plaintiff was injured as a result of NASSAR's sexual assault, abuse, and molestation, as described above. These acts were performed during the course of NASSAR's employment, agency, and/or representation with USAG.

282.  Plaintiff was injured because she relied on USAG to provide employees, agents, and representatives who exercise reasonable skill and care.

283.  As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-

esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

### COUNT XIX
### NEGLIGENT SUPERVISION

284. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

285. USAG had a duty to provide reasonable supervision of its employee, agent, and/or representative, NASSAR, while he was in the course of his employment, agency, and/or representation with USAG and while he interacted with young female athletes and Plaintiff.

286. Given the known sexual abuse in youth sports and gymnastics, it was reasonably foreseeable that NASSAR, who had prior allegations against him, would sexually abuse his patients, including Plaintiff, unless properly supervised.

287. USAG by and through its employees, agents, managers, and/or assigns, such as Mr. Penny and Mr. Colarassi, knew or reasonably should have known of NASSAR's conduct and/or that NASSAR was an unfit employee, agent, and/or representative because of his sexual interest in children and his sexual deviancy towards women of all ages.

288. USAG breached its duty to provide reasonable supervision of NASSAR, and permitted NASSAR, who was in a position of trust and authority, to sexually assault, abuse, molest, and harass Plaintiff.

289. The above sexual assault, abuse, molestation, and harassment occurred while NASSAR was in the course of his employment, agency, and/or representation with USAG.

290. USAG tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in NASSAR violating the rights of USAG members, such as Plaintiff, with impunity.

291. As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XX
## NEGLIGENT FAILURE TO WARN OR PROTECT

292. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

293. Given the direct or indirect knowledge of sexual abuse in youth sports, and in particular gymnastics, it was reasonably foreseeable that sexual abuse of young females may occur if proper procedures were not put in place by USAG.

294. USAG knew or should have known that NASSAR posed a risk of harm to Plaintiff and/or others in Plaintiff's situation.

295. USAG knew or should have known that NASSAR committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

296. USAG had actual and/or constructive knowledge as to the dangerous conduct of NASSAR and failed to act reasonably and responsibly in response.

297.  USAG had a duty to warn or protect the public, Plaintiff, and others in Plaintiff's situation against the risk of injury by NASSAR.

298.  The special, trusting, confidential, and fiduciary relationship between NASSAR, in his capacity as an employee, agent, and/or representative of USAG, and Plaintiff created a duty to disclose this information.

299.  USAG breached the duty owed to Plaintiff by failing to warn the public and Plaintiff and/or by failing to take reasonable steps to protect the public and Plaintiff from NASSAR.

300.  USAG breached its duties to protect Plaintiff by failing to detect and/or uncover evidence of sexual assault, abuse, molestation, and harassment.

301.  USAG breached its duty to protect Plaintiff by failing to investigate, adjudicate, suspend, and/or ban NASSAR from USAG affiliation.

302.  USAG failed to adequately screen, counsel and/or discipline NASSAR for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician in his capacity as an employee, agent, and/or representative of USAG, resulting in violations of Plaintiff's rights.

303.  USAG willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from NASSAR's conduct.

304.  As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXI
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE

305.  Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

306.  USAG had a duty to protect the public and Plaintiff and others in Plaintiff's situation against the risk of injury by NASSAR.

307.  USAG breached the duty owed to the public and Plaintiff to take reasonable protective measures to protect Plaintiff, and others in Plaintiff's situation, by failing to properly train or educate Plaintiff, and other individuals in Plaintiff's situation, about how to avoid a risk of sexual assault and/or sexual abuse, including sexual assault and/or sexual abuse by NASSAR.

308.  USAG failed to implement reasonable safeguards to:

a.   Prevent acts of sexual assault, abuse, and molestation by NASSAR; and

b.   Avoid placing NASSAR in positions where he would have unsupervised contact and interaction with Plaintiff and other young athletes.

309.  As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXII
## NEGLIGENT RETENTION

310. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

311. USAG had a duty owed to Plaintiff and others in Plaintiff's situation when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents, and/or representative to exercise due care.

312. USAG breached the duties owed to Plaintiff by failing to adequately investigate, report, and address complaints about NASSAR's conduct, which USAG knew or should have known.

313. USAG breached the duties owed to Plaintiff when USAG retained NASSAR as an employee, agent, and/or representative after USAG discovered or should have reasonably discovered NASSAR's conduct, which reflected a propensity for sexual misconduct.

314. USAG's failure to act in accordance with the standard of care resulted in NASSAR gaining access to and sexually assaulting and/or sexually abusing Plaintiff and an unknown number of other individuals.

315. The above conduct of USAG in credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of NASSAR created a foreseeable risk of harm to Plaintiff and other minors and young adults.

316. USAG's retention of NASSAR resulted in Plaintiff relying on such credentials as she sought medical treatment.

317. As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining

the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

318. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

319. USAG allowed NASSAR to be in a position where he could sexually assault, abuse, and molest children and young adults.

320. USAG held NASSAR in high esteem and acclaim, which encouraged Plaintiff and others to respect and trust NASSAR and seek out his services without questioning his motives or methods.

321. USAG protected NASSAR in part to bolster and sustain his national and international reputation in the gymnastics community.

322. A reasonable person would not expect USAG to tolerate or permit an employee, agent, and/or representative to carry out sexual assault, battery, molestation, or harassment after the USAG Defendants knew or should have known of complaints of such sexual assault, battery, molestation, and harassment occurring during NASSAR's treatments.

323. A reasonable person would not expect USAG to be incapable of supervising NASSAR and/or preventing NASSAR from conducting acts of sexual assault, abuse, molestation, and harassment.

324. By protecting NASSAR and encouraging the perpetuation of his reputation, USAG acted in a way that was beyond all possible bounds of decency in failing to protect Plaintiff and others from NASSAR's conduct.

325.  USAG's conduct as described above was intentional and/or reckless, and constitutes extreme and outrageous conduct.

326.  As a direct and proximate result of USAG's egregious, extreme, and outrageous actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXIV
## FRAUD AND MISREPRESENTATION

327.  Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

328.  From approximately 1996 to summer 2015, USAG represented to Plaintiff and the public that NASSAR was a competent, safe, and highly regarded physician.

329.  By representing, including on its own website, that NASSAR was a team physician and an athletic physician at MSU and a National Team Physician with USAG, USAG represented to Plaintiff and the public that NASSAR was safe, trustworthy, and of high moral and ethical repute and that Plaintiff and the public could readily utilize the services of NASSAR without being harmed.

330.  The above representations regarding NASSAR's reputation and character were false when they were made because NASSAR had and was continuing to sexually assault, batter, molest, and harass his patients and other individuals.

331.  Additionally, complaints were made to USAG, yet USAG did not contact Plaintiff, the police, MSU Defendants, other individuals it had referred to NASSAR, or any other clubs or organizations affiliated with NASSAR to inform them of the allegations and potential harm to Plaintiff and others.

332.  USAG continued to portray NASSAR as a competent and safe physician, including on its own website, perpetuating and intentionally inducing Plaintiff and the public to rely on the reputation of NASSAR.

333.  Plaintiff trusted and relied on the assertions of USAG and sought medical treatment from NASSAR while USAG knew of concerns and dangers.

334.  As a result of Plaintiff's and the public's trust and reliance on USAG's fraudulent misrepresentation regarding NASSAR, Plaintiff and others were sexually assaulted, abused, molested, and harassed by NASSAR.

335.  As a direct and proximate result of USAG's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

**PLAINTIFF'S ACCOUNTS AGAINST TWISTARS AND JOHN GEDDERT**
**(collectively "TWISTARS")**

**COUNT XXV**
**GROSS NEGLIGENCE AND NEGLIGENCE**

336. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

337. TWISTARS owed Plaintiff a duty to use due care, and a duty of ordinary care, to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with its employees, representatives, and/or agents, including NASSAR, when Plaintiff was an invitee and under a contractual obligation for services.

338. Plaintiff was a gymnast who was contracted, through her parents, with TWISTARS to provide gymnastics training.

339. TWISTARS is a business incorporated and legally formed in the State of Michigan, under the laws of Michigan, and provided gymnastics training to Plaintiff.

340. Plaintiff entered TWISTARS's premises for the purpose of eliciting services from TWISTARS, who did provide such services for commercial gain.

341. Plaintiff had a reasonable expectation to enter TWISTARS for the services she contracted and was invited for and a reasonable person would expect TWISTARS to not tolerate or permit an employee, agent, or representative to break the law, specifically to not carry out sexual assault, abuse, or molestation under the guise of medical treatment.

342. TWISTARS owed the public and Plaintiff a duty to use due care to ensure safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents.

343. TWISTARS owed Plaintiff a duty to maintain and prepare its premises, employees, representatives, and agents in a manner that would reasonably keep Plaintiff safe from unreasonable risks known to TWISTARS, or that should have been known by TWISTARS. TWISTARS owed a duty to warn Plaintiff of open and obvious dangers to her safety and well-being.

344. TWISTARS contained knowledge that it could reasonably foresee that NASSAR would carry out criminal activity and TWISTARS did not actively take reasonable measures to ensure that such criminal activity was thwarted and not perpetuated on its premises.

345. TWISTARS likewise created an environment that was hostile to its members by subjecting them to imminent and known harm with active negligence. TWISTARS created an environment that was excessively competitive at any and all costs, including utilizing and associating with NASSAR. By associating and inviting NASSAR into its facility, TWISTARS took upon itself the duties that are carried by such invitation and attached a duty to keep its gymnasts safe against reasonable harm. Plaintiff entered into a special, confidential, and fiduciary relationship with NASSAR and TWISTARS, when TWISTARS allowed, encouraged, and gained notoriety by having NASSAR perform medical treatment on its premises. TWISTARS therefore owed a duty to use care and ensure that its employees, agents, and/or representatives would use reasonable care and skill and not harm Plaintiff.

346. TWISTARS intentionally created a hostile and harmful environment, breaching their duty to its gymnasts, by giving NASSAR a specific place in the gym to see the girls, clearing out a closet to give him privacy, encouraging the gymnasts to see NASSAR, and keeping the gym open after hours so he could see more girls in a private and secluded setting, including Plaintiff.

347. TWISTARS's conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety.

348. TWISTARS breached its contract with Plaintiff by not upholding a safe environment for her to train.

349. TWISTARS held NASSAR out as a valuable part of their training and encouraged gymnasts, including Plaintiff, to seek his medical advice, knowingly placing the gymnasts, including Plaintiff, in imminent danger of harm and molestation.

350. TWISTARS knew or should have known of complaints pertaining to NASSAR's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment. As early as 1997 John Geddert, TWISTARS's owner and operator at the time of Plaintiff's harm, knew of specific allegations and complaints from other gymnasts that NASSAR was inappropriately touching them and making them uncomfortable. Geddert had readily identifiable and foreseeable knowledge that NASSAR was a danger to his gymnasts, including Plaintiff. Geddert made a willful election to ignore such complaints for his continued business gain and increased reputation by specifically and intentionally allowing, and even encouraging, NASSAR to continue seeing his gymnasts in his gym, with his permission, and with NASSAR being a representative and/or agent of TWISTARS.

351. AS TO GROSS NEGLIGENCE:

   a. NASSAR's conduct in sexually assaulting, abusing, and molesting Plaintiff in the course of his employment, agency, and/or representation of TWISTARS under the guise of proper medical treatment was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff, specifically when such action was foreseeable.

   b. TWISTARS's failure to adequately supervise NASSAR and to properly investigate known allegations against NASSAR was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiff.

  c. These acts by TWISTARS were committed with reckless disregard to Plaintiff's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to Plaintiff, abridging TWISTARS's duty to keep Plaintiff safe, and therefore TWISTARS's actions were grossly negligent.

352. AS TO NEGLIGENCE:

  a. TWISTARS's conduct demonstrated a willful disregard for precautions to ensure Plaintiff's safety, creating a substantial, imminent, and real risk to Plaintiff.

  b. TWISTARS's failure to properly investigate, address, and remedy complaints regarding NASSAR's conduct was a breach of ordinary care and was therefore negligent.

353. As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXVI
## VICARIOUS LIABILITY

354. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

355. Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

356. Vicarious liability essentially creates agency between the principal and its agent so that the principal is held to have done what the agent has done.

357. TWISTARS employed and/or held NASSAR out to be its agent and/or representative.

358. TWISTARS paid NASSAR with gratuities, complimentary food, travel, and other valuable consideration when he was working for, and/or representing TWISTARS at competitions, practices, and other events.

359. TWISTARS held NASSAR out as a valuable part of their training and encouraged gymnasts to seek his medical advice, knowingly placing the gymnasts in imminent danger of harm and molestation.

360. TWISTARS is vicariously liable for the actions of NASSAR, as described above, that were performed during the course of his employment, representation, and/or agency with TWISTARS.

361. TWISTARS had actual and/or constructive knowledge of NASSAR sexually assaulting, battering, molesting, and harassing young females on several occasions under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with TWISTARS.

362. TWISTARS had actual and/or constructive knowledge of NASSAR's propensity for sexually assaulting, battering, molesting, and harassing his patients and other females under the guise of medical treatment and/or during the course of his employment, agency, and/or representation with TWISTARS, beginning in or around 1996.

363. It was reasonably foreseeable that NASSAR would continue to sexually assault, batter, molest, and harass females (under the guise of medical treatment and/or during the course

of his employment, agency, and/or representation with the TWISTARS) with the actual and/or constructive knowledge TWISTARS had of such conduct.

364. As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXVII
## EXPRESS/IMPLIED AGENCY

365. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

366. An agent is a person who is authorized by another to act on its behalf. TWISTARS intentionally and/or negligently made representations that NASSAR was its employee, agent, and/or representative.

367. On the basis of those representations, Plaintiff reasonably believed that NASSAR was acting as an employee, agent, and/or representative of TWISTARS.

368. Upon information and belief, TWISTARS referred significant numbers of gymnasts to NASSAR for medical treatment at his office on MSU's campus and to CLINIC.

369. Plaintiff was injured as a result of NASSAR's sexual assault, abuse, and molestation, as described above. These acts were performed during the course of NASSAR's employment, agency, and/or representation with TWISTARS.

370. Plaintiff was injured because she relied on TWISTARS to provide employees, agents, and representatives who exercise reasonable skill and care.

371. As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXVIII
### NEGLIGENT SUPERVISION

372. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

373. TWISTARS had a duty to provide reasonable supervision of its employee, agent, and/or representative, NASSAR, while he was in the course of his employment, agency, and/or representation with TWISTARS and while he interacted with young female athletes and Plaintiff.

374. Given the known sexual abuse in youth sports and gymnastics, it was reasonably foreseeable that TWISTARS, who had prior allegations against him, would sexually abuse his patients, including Plaintiff, unless properly supervised.

375. TWISTARS by and through its employees, agents, managers, and/or assigns, such as Mr. and Mrs. Geddert, knew or reasonably should have known of NASSAR's conduct and/or that NASSAR was an unfit employee, agent, and/or representative because of his sexual interest in children and young adults.

376. TWISTARS breached its duty to provide reasonable supervision of NASSAR, and permitted NASSAR, who was in a position of trust and authority, to sexually assault, abuse, molest, and harass Plaintiff.

377. The above sexual assault, abuse, molestation, and harassment occurred while NASSAR was in the course of his employment, agency, and/or representation with TWISTARS.

378. TWISTARS tolerated, authorized, encouraged, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in the allowance of NASSAR to violate the rights of persons such as Plaintiff with impunity.

379. As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXIX
## NEGLIGENT FAILURE TO WARN OR PROTECT

380. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

381. Given the direct or indirect knowledge of sexual abuse in youth sports in general, and because John Geddert has specific knowledge of NASSAR's proclivities by direct complaints from gymnasts, it was reasonably foreseeable that sexual abuse of young females may occur if proper procedures were not put in place by TWISTARS.

382. TWISTARS knew or should have known that NASSAR posed a risk of harm to Plaintiff and/or others in Plaintiff's situation.

383. TWISTARS knew or should have known that NASSAR committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

384. TWISTARS had actual and/or constructive knowledge as to the dangerous conduct of NASSAR and failed to act reasonably and responsibly in response.

385. TWISTARS had a duty to warn or protect the public, Plaintiff, and others in Plaintiff's situation against the risk of injury by NASSAR.

386. The special, trusting, confidential, and fiduciary relationship between NASSAR, in his capacity as an employee, agent, and/or representative of TWISTARS, and Plaintiff created a duty to disclose this information.

387. TWISTARS breached the duty owed to Plaintiff by failing to warn the public and Plaintiff and/or by failing to take reasonable steps to protect the public and Plaintiff from NASSAR.

388. TWISTARS breached its duties to protect Plaintiff by failing to detect and/or uncover evidence of sexual assault, abuse, molestation, and harassment.

389. TWISTARS breached its duty to protect Plaintiff by failing to investigate, suspend, and/or ban NASSAR from affiliation with TWISTARS.

390. TWISTARS failed to adequately screen, counsel, train, investigate, and/or discipline NASSAR for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician in his capacity as an employee, agent, and/or representative of TWISTARS, resulting in violations of Plaintiff's rights. TWISTARS likewise failed to adequately screen, counsel, train, investigate, and/or discipline NASSAR for physical

and/or mental conditions as an employee, agent, and/or representative of TWISTARS regardless of NASSAR's qualification, reputation, or medical license.

391.  TWISTARS willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from NASSAR's conduct.

392.  TWISTARS willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiff from NASSAR's conduct.

393.  As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXX
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE

394.  Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

395.  TWISTARS had a duty to provide reasonable supervision of its employee, agent, and/or representative, NASSAR, while he was in the course of his employment, agency, and/or representation with TWISTARS and while he interacted with young female athletes and Plaintiff.

396.  TWISTARS had a duty by its contract with Plaintiff to create a safe environment to conduct gymnastics training.

397.  Given the known sexual abuse in youth sports and gymnastics, it was reasonably foreseeable that TWISTARS, who had prior allegations against him, would sexually abuse his patients, including Plaintiff, unless properly supervised.

398.  TWISTARS by and through its employees, agents, managers, and/or assigns, such as Mr. and Mrs. Geddert, knew or reasonably should have known of NASSAR's conduct and/or that NASSAR was an unfit employee, agent, and/or representative because of his sexual interest in children and young women.

399.  TWISTARS breached its duty to provide reasonable supervision of NASSAR, and permitted NASSAR, who was in a position of trust and authority, to sexually assault, abuse, molest, and harass Plaintiff.

400.  TWISTARS breached its contract with Plaintiff by creating a hostile environment and unsafe services for gymnastics training by associating with NASSAR.

401.  The above sexual assault, abuse, molestation, and harassment occurred while NASSAR was in the course of his employment, agency, and/or representation with TWISTARS.

402.  TWISTARS tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in the allowance of NASSAR to violate the rights of persons such as Plaintiff with impunity.

403.  As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining

the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXXI
## NEGLIGENT RETENTION

404. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

405. TWISTARS had a duty owed to Plaintiff and others in Plaintiff's situation when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents, and/or representative to exercise due care.

406. TWISTARS breached the duties owed to Plaintiff by failing to adequately investigate, report, and address complaints about NASSAR's conduct, which TWISTARS knew or should have known.

407. TWISTARS breached the duties owed to Plaintiff when TWISTARS retained NASSAR as an employee, agent, and/or representative after TWISTARS discovered, or should have reasonably discovered, and knew of NASSAR's allegations and conduct from other gymnasts, which reflected a propensity for sexual misconduct.

408. TWISTARS's failure to act in accordance with the standard of care resulted in NASSAR gaining access to and sexually assaulting and/or sexually abusing Plaintiff and an unknown number of other individuals.

409. The above conduct of TWISTARS in credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of NASSAR created a foreseeable risk of harm to Plaintiff and other minors and young adults.

410.   TWISTARS's retention of NASSAR resulted in Plaintiff relying on such credentials as she sought medical treatment.

411.   As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## COUNT XXXII
## FRAUD AND MISREPRESENTATION

412.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

413.   At all relevant times of Plaintiff's relationship with TWISTARS, TWISTARS represented to Plaintiff and the public that NASSAR was a competent, safe, and highly regarded physician.

414.   By representing that NASSAR was a team physician and an athletic physician at MSU, a National Team Physician with USAG, and the Team Physician with TWISTARS, TWISTARS represented to Plaintiff and the public that NASSAR was safe, trustworthy, and of high moral and ethical repute and that Plaintiff and the public could readily utilize the services of NASSAR without being harmed.

415.   The above representations regarding NASSAR's character were false when they were made because NASSAR had and was continuing to sexually assault, batter, molest, and harass unknown number of his patients and other individuals.

416.  Additionally, complaints were made to TWISTARS, yet TWISTARS did not contact Plaintiff, the police, MSU, USAG, other individuals it had referred to NASSAR, or any other clubs or organizations affiliated with NASSAR to inform them of the allegations and potential harm to Plaintiff and others.

417. TWISTARS continued to portray NASSAR as a competent and safe physician, intentionally inducing Plaintiff and the public to rely on the reputation of NASSAR that TWISTARS was perpetuating.

418. Plaintiff trusted and relied on the assertions of TWISTARS and sought medical treatment from NASSAR while TWISTARS knew of concerns and dangers.

419. As a result of Plaintiff's and the public's trust and reliance on TWISTARS's fraudulent misrepresentation regarding NASSAR, Plaintiff and others in Plaintiff's situations were sexually assaulted, abused, molested, and harassed by NASSAR.

420. Plaintiff was subjected to sexual assault, abuse, molestation, and harassment as a result of TWISTARS's fraudulent misrepresentations regarding NASSAR.

421.  As a direct and proximate result of TWISTARS's actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## DAMAGES FOR ALL CAUSES OF ACTION IN THIS COMPLAINT AND AGAINST ALL DEFENDANTS

422. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

423. As a direct and proximate result of all Defendants' combined actions and inactions, Plaintiff has suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, anxiety, sleep issues, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, has been prevented from obtaining the full enjoyment of sexual life, spiritual conflict and confusion, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

424. The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiff's Constitutional and Federal rights as well as the common and/or statutory laws of the State of Michigan, and the United States District Court has jurisdiction to hear and adjudicate all claims.

425. In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiff has and continues to suffer irreparable harm as a result of the violations.

426. The amount in controversy exceeds the jurisdictional minimum of $75,000.00.


**WHEREFORE,** Plaintiff requests this Court and the finder of fact enter a Judgment in Plaintiff's favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiff all applicable damages, including but not limited to compensatory, special, exemplary, and/or punitive damages, in whatever amount the Plaintiff is entitled, and all other relief arising out of law,

equity, and fact, also including but not limited to:

> (a) Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

> (b) Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

> (c) Reasonable attorney fees, interest, and costs; and

> (d) Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Dated:  September 6, 2018                    RESPECTFULLY SUBMITTED,


                                             /s/ PAUL H. GRANT
                                             _____
                                             PAUL H. GRANT (P72906)
                                             PLANNING WITH PURPOSE, INC
                                             Attorney for Plaintiff
                                             2031 – 196th St SW, Suite B-201
                                             Lynnwood, WA 98036
                                             T (425) 939-9948 / F (800) 569-4004
                                             paul@planningwithpurposeinc.com

/s/  MATTHEW A. FERRI

MATTHEW A. FERRI (P71439)
LAW OFFICE OF MATTHEW A. FERRI, PLLC
Attorney for Plaintiff
6001 N. Adams Road, Suite 135
Bloomfield Hills, Michigan 48304
T (248) 409-0256 / F: (248) 409-0266
matt@ferrilawpllc.com

## JURY DEMAND

Plaintiff, by and through her attorneys, PAUL H. GRANT of Planning With Purpose, Inc, and MATTHEW FERRI of THE LAW OFFICE OF MATTHEW A. FERRI, hereby demand a trial by jury on all claims set forth above.

Dated:  September 6, 2018                    RESPECTFULLY SUBMITTED,

/s/ PAUL H. GRANT

PAUL H. GRANT (P72906)
PLANNING WITH PURPOSE, INC
Attorney for Plaintiff
2031 – 196th St SW, Suite B-201
Lynnwood, WA 98036
T (425) 939-9948 / F (800) 569-4004
paul@planningwithpurposeinc.com

/s/  MATTHEW A. FERRI

MATTHEW A. FERRI (P71439)
LAW OFFICE OF MATTHEW A. FERRI, PLLC
Attorney for Plaintiff
6001 N. Adams Road, Suite 135
Bloomfield Hills, Michigan 48304
T (248) 409-0256 / F: (248) 409-0266
matt@ferrilawpllc.com

# EXHIBIT 1

| STATE OF MICHIGAN | | C/COC/MI **CASE NO.** |
| COURT OF CLAIMS | **NOTIFICATION** | 18-200344-O |

Court address 925 W. OTTAWA ST., P.O. BOX 30185
LANSING, MI 48909

Court telephone no.
(517) 373-0807

Judge: _____

Date: 8/6/2018 _____

TO:

MATTHEW A. FERRI
48707 VAN DYKE AVE
SHELBY TOWNSHIP MI 48317-2562

| Plaintiff/Petitioner | v | Defendant/Respondent |
| JANE RG DOE | | MICHIGAN STATE UNIVERSITY
ET AL |

Comments: This notification acknowledges the notice of claim received on August 3, 2018 has
been processed by the Court of Claims.

Your notice of claim was assigned tracking number 18-200344-O.   Please note that
this is a tracking number rather than a case number.  Filing a notice of intent or a
notice of claim DOES NOT initiate a case in the Court of Claims. [MCL 600.6431].

Acceptance of your notice of claim by the clerk's office does not signify that it
meets the pertinent statutory requirements.  You are responsible for ensuring that
the notice of claim complies with the requirements for the type of claim you intend
to file, including a signature and notarization.

See MCL 600.6431(1).  Requirements for certain types of claims may also be found at
MCL 691.1404 and MCL 691.1406.

This notice has also been sent to:

MATTHEW A. FERRI                                    P 71439 Attorney for PTF 1

DEF 1      MICHIGAN STATE UNIVERSITY

**NTF**              **NOTIFICATION**

NOT  MC - 200344 - 0



**Law Office of Matthew A Ferri, PLLC**

*Matthew A. Ferri, Esq.*
*Matt@ferrilawpllc.com*

August 1, 2018

Court of Claims Clerk's Office
Hall of Justice
925 W. Ottawa Street
P.O. Box 30185
Lansing, MI 48909

Michigan State University
Office of the General Counsel
426 Auditorium Road, Room 494
East Lansing, MI 48824

Bill Schuette
Attorney General, State of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
P.O. Box 30212
Lansing, MI 48909

Michigan State University
John Engler
Office of the President
426 Auditorium Road
Hannah Administration Building, Room 450
East Lansing, MI 48824-1046

Michigan State University
Board of Trustees
**Brian Breslin, Chairman**
426 Auditorium Road
Hannah Administration Building, Room 450
East Lansing, MI 48823

MSU Sports Medicine
4660 South Hagadorn Road, Ste. 420
East Lansing, MI 48823

> **RE:** **Notice of Intention to file Claim Pursuant to MCL 600.6431**
> **Our Client Jane R. G. Doe**

(stamp) RECEIVED 2018 AUG -3 PM 2: 09 COURT OF CLAIMS JEROME W ZIMMER

Potential Adverse Parties:          Michigan State University
                                    Lawrence Nassar, William Strampel,
                                    Jeffrey R. Kovan, Douglas Dietzel,


Potential Claims:                   Violations of Title IX; 42 U.S.C. § 1983;
                                    Sexual Assault; Sexual Battery; Constructive Fraud;
                                    Negligence; Gross Negligence; Negligent
                                    Supervision; Negligent Hiring and Retention;
                                    Negligence Failure to Warn, Train, or Educate;
                                    Vicarious Liability-Agency Respondeat Superior;
                                    Express or Implied Agency; Medical Malpractice;
                                    Fraudulent Concealment; Failure to Notify
                                    Claimant

Pending Litigation:                 *Denhollander, et al v. Michigan State University, et
                                    al.,* U.S. Dist. Ct., W.D. Mich. Case No. 1:17-cv-
                                    00029. All allegations pleaded in this litigation are
                                    incorporated by reference.

To Whom It May Concern:

Please be advised the law firms of Planning With Purpose, Inc. and Law Office of Matthew A. Ferri, PLLC, represent the individual listed above. This notice is for Jane R. G. Doe, a minor at all times of the allegations, who was a victim of sexual assault by Lawrence Nassar, an employee of Michigan State University.

Pursuant to MCL 600.6431, please accept this letter as a Notice of Intent to File Claim, which includes a notarized signature from our client's legal representative, Attorney Matthew A. Ferri. Plaintiff intends to file a civil action for declaratory, injunctive, equitable, and monetary relief in the United States District Court, Western District of Michigan.

This Notice serves as our client's formal intent to file claims against Michigan State University, Lawrence Nassar, a former employee/agent/representative of Michigan State University, and any other entity, division, department, representative or agent of MSU involved in the treatment of claimants, investigation of complaints, or involved in the employment aspects of Lawrence Nassar, including but not limited to hiring, retention, supervision, and monitoring.

Our client's potential claims include, but are not limited to the following:

- Violations of Title IX
- 42 U.S.C. §1983
- Sexual Assault
- Sexual Battery
- Constructive Fraud

- Negligence
- Gross Negligence
- Negligent Supervision
- Negligent Hiring and Retention
- Negligent Failure to Warn, Train, or Education
- Vicarious Liability-Agency-Respondeat Superior
- Express or Implied Agency
- Medical Malpractice
- Fraudulent Concealment
- Failure to Notify Claimant

The claims arise out of multiple instances of sexual assault and battery, molestation, and harassment of our client by then Dr. Lawrence Nassar, an employee/agent/representative, etc. of Michigan State University in approximately 2007. Specifically, the claims arise out of Nassar's touching of our client's genital area without proper notice, gloves, lubricant, or chaperones under the guise of providing medical care and treatment, at his office Michigan State University. It is our belief Nassar used his position of trust and confidence in an abusive manner.

Our client was made aware of Nassar's conduct on or around September 12, 2016, following publication regarding a complaint filed with the Michigan State University Police, and the media coverage that ensued following the initial article.

Our client has injuries including but not limited to shock, humiliation, emotional distress, and related physical manifestations thereof, psychological injury, embarrassment, loss of self-esteem, disgrace, loss of earnings or earning capacity, and loss of enjoyment of life.

Please be advised that we reserve the right to amend this Notice to include additional claims or defendants discovered through the course of litigation.  We also reserve the right to amend the claimant's signature in the event she is not able to proceed under the pseudonym, Jane R. G. Doe.

Sincerely,


Matthew A. Ferri

I declare that the statements above are true to the best of my information, knowledge, and belief.

Dated:  August 1, 2018  .

_Jane R.G. Doe_
Jane R. G. Doe, Claimant

STATE OF WASHINGTON    }
                       } ss.
COUNTY OF SNOHOMISH    }

Signed and affirmed before me on August 1, 2018, by Claimant.

LATISHA MINER,
Notary Public in and for the State of Washington
My commission expires: September 26, 2020
Residing in Lynnwood, WA